UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHAWN EDWARD HALL,

              Plaintiff,

     v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

              Defendant.
_____

DECISION & ORDER

12-CV-6639P

## PRELIMINARY STATEMENT

Plaintiff Shawn E. Hall ("Hall") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 13).

Currently before the Court is Hall's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket # 12).  Hall requests that the Court reverse the judgment of the Commissioner and remand for calculation of benefits or for further administrative proceedings.  (*Id.*).  Also pending before the Court is the Commissioner's motion for judgment on the pleadings.  (Docket # 9).  For the reasons set forth

---

    [1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

I. **Procedural Background**

Hall applied for DIB on May 5, 2010, alleging disability since November 25, 2009 due to diabetes with neuropathy in the legs, heart arrhythmia, arthritis in the knees and legs, stomach problems, severe weight loss and a learning disability (Tr. 72, 90, 96).[2] On June 22, 2010, the Social Security Administration denied Hall's claim for disability benefits, finding that he was not disabled. (Tr. 63, 66). Hall requested and was granted a hearing before Administrative Law Judge Edward J. Pitts (the "ALJ"). (Tr. 35-39, 56-57). The ALJ conducted a hearing on April 19, 2011 in Forney, New York. (Tr. 1192-245). Hall was represented at the hearing by his attorney, Ida M. Comerford, Esq. (Tr. 42, 1192). In a decision dated June 15, 2011, the ALJ found that Hall was not disabled and thus was not entitled to benefits. (Tr. 17-32). On September 28, 2012, the Appeals Council denied Hall's request for review of the ALJ's decision. (Tr. 6-11). Hall commenced this action on November 26, 2012 seeking review of the Commissioner's decision. (Docket # 1). Hall had previously applied for benefits, which the Commissioner denied by decisions dated August 25, 1998, December 13, 2000 and May 21, 2007. (Tr. 91-92).

II. **Non-Medical Evidence**

Hall was born on December 22, 1963 and is now fifty years old. (Tr. 126). Hall attended high school in a special education class setting through the tenth grade, when he

---

[2] The administrative transcript shall be referred to as "Tr. __."

2

dropped out to support his family "because [his] father [had become] blind." (Tr. 97, 1198). Hall has since attempted, but failed to obtain his GED. (Tr. 1242).

Hall's previous work history includes employment as a diesel mechanic, a tire-retreading machine operator, and briefly as a groundskeeper. (Tr. 1199-203). From approximately 1997 through 2000, Hall worked at Main Tire Exchange "taking the tires out of the cookers." (Tr. 78-79, 98, 1199-200). In 2000, Hall returned to work at TA Operating LLC, Travel Centers of America (Tr. 79-80, 98), where he had worked prior to Main Tire Exchange. At TA Operating LLC, Hall worked as a mechanic, changing oil and tires and replacing batteries on tractor trailers. (Tr. 79-80, 1201-202). Hall remained at TA Operating LLC until late 2009. (Tr. 80, 1202-203). In June 2010, Hall was hired by the State of New York as a groundskeeper at Letchworth State Park (Tr. 86, 966), but was discharged shortly thereafter when his background check revealed a prior felony conviction (Tr. 1203). Hall has not worked since his discharge from Letchworth State Park. (Tr. 1204).

When Hall applied for disability benefits, he lived with his wife and two sons. (Tr. 72-73, 116, 1212). Hall reported that his daily activities included getting up to take medications, feeding the dogs with help from his sons (Tr. 116-17), showering and dressing himself (Tr. 1213), watching TV and occasionally attempting to help his wife wash the dishes (Tr. 1216, 1236). Hall and his wife each testified that Hall's wife does all of the family's shopping and food preparation and the vast majority of the household chores on her own. (Tr. 118-20, 1216). Hall testified that he rarely leaves the house except for medical appointments, and cannot drive or ride in a vehicle more than approximately twenty-five miles without severe pain. (Tr. 1216-17). Hall testified he wears Velcro shoes to avoid having to bend over to tie his

shoes. (Tr. 1213). Hall reported that he has trouble sleeping through the night due to the pain in his back and legs and feels "strung out" and "tired" during the day. (Tr. 1231).

According to Hall, he had been diagnosed with severe stenosis of the spine and received pain management treatment from Dr. Grover. (Tr. 1205). Hall testified that he had received injections and ablation procedures to address the pain in his back that was caused by discs in his back that were in contact with his nerve endings. (Tr. 1206). According to Hall, if the ablation proved unsuccessful, he would be referred to a neurosurgeon. (Tr. 1206-207).

According to Hall, prior to the onset of his disabilities, he would go hunting and fishing approximately two to three times weekly. (Tr. 1220). Hall testified he has not been hunting since sometime in 2009 (*id.*) and went fishing just once in 2010 (Tr. 1219).[3]

Hall testified that his impairments have limited his ability to walk for distances greater than approximately twenty feet before experiencing severe pain. (Tr. 1215-16). Hall also testified he is unable to sit for more than ten to fifteen minutes at a time before experiencing pain. (Tr. 1215). According to Hall, he has trouble grabbing things due to numbness in his fingers and has dropped things "quite a bit." (Tr. 1227). Hall also reported he has "balance problems" due to numbness in his feet and falls "quite a bit." (Tr. 1227-230). According to Hall, he has a "walking stick" he uses when he is outside to help keep him "straightened up." (Tr. 1227-28).

---

[3] A progress note from Hall's treating physician, Dr. Witte, dated December 9, 2010, noted that Hall reported he was "walking alot [sic] hunting" and had fallen in a creek the prior week. (Tr. 957).

III.  **Relevant Medical Evidence**[4]

    A.  **Treatment Records**

        1.  **Pre-Alleged Onset Date**

In support of his disability application, Hall provided medical records to the ALJ dating from 1998. The records predating Hall's alleged disability onset date primarily focus on Hall's cardiac issues, knee issues, and diabetic care. (Tr. 143-632).

           a.  **Dr. Witte – Primary Care**

The record indicates that Tony Witte ("Witte"), MD, provided primary care treatment to Hall for twenty-six years. (Tr. 960, 1197). As Hall's primary care physician, Witte treated Hall primarily for diabetes and addressed Hall's medical concerns as they arose.[5] (Tr. 931-58).

On June 10, 2009, Witte referred Hall to Robert Capecci ("Capecci"), MD, with symptoms of a torn menicus. (Tr. 945). On June 12, 2009, Witte's records show an MRI was approved and was in the process of being reviewed. (*Id.*). On July 7, 2009, Witte examined Hall, who was reporting pain in his right foot and toe. (Tr. 944). Witte examined Hall again on July 15, 2009, noting an infection in a toe on Hall's right foot. (Tr. 942). Witte made notes on August 6, 2009 for Hall to elevate his foot. (Tr. 941).

           b.  **Dr. Iqbal – Cardiologist**

Syed Iqbal ("Iqbal"), MD, has been Hall's treating cardiologist for at least nine years. (Tr. 351-52, 1223). Iqbal performed or was informed of all of Hall's cardiac procedures, including the insertion of a reveal monitor in 2005 (Tr. 351-52), chest scans to evaluate and diagnose chest pains in 2005 (Tr. 313-14), an invasive diagnostic procedure on October 25, 2006

---

[4] Those portions of the treatment records that are relevant to this decision are summarized herein.

[5] The majority of Witte's records are hand-written and difficult to read. (Tr. 623-39, 932-52).

(Tr. 190-95), the placement of a holter monitor on July 14, 2008, following arrhythmia and an ablation (Tr. 323-24, 477-78), a diagnostic EPS test and ablation on November 17, 2008 (Tr. 147-49, 226), and a chest scan on March 12, 2009 (Tr. 328-29). The record also reflects Iqbal's concern over the effect of Hall's weight on his cardiac conditions and Iqbal's repeated advice to Hall to lose weight and exercise. (*See* Tr. 481, 484, 489, 493, 499). At an appointment with Iqbal on April 30, 2009, Hall reported that he was walking one mile a day without any problems. (Tr. 484-85).

### c.   **Dr. Capecci – Orthopedist**

Capecci began treating Hall's orthopedic issues in 2009.[6] (Tr. 420, 945). At an exam on June 23, 2009, Hall reported six months of left knee pain. (Tr. 420-21). Capecci reported that Hall had a full range of motion in the left knee; however, there was "tenderness to palpation of the lateral compartment [and] McMurray's test [was] painful laterally." (*Id.*). Capecci assessed that Hall appeared to have a tear in the lateral meniscus and ordered an MRI. (*Id.*). Capecci reviewed the MRI results with Hall on July 27, 2009 and determined that there was internal derangement of Hall's left knee and a possible tear of his medial meniscus, but the MRI was not conclusive. (Tr. 418-19). Capecci planned to proceed with an arthroscopic evaluation. (*Id.*). On September 21, 2009, Hall received a diagnostic arthroscopy of his left knee, (Tr. 415-17), followed by an arthroscopic lateral meniscectomy and synovial biopsy of the left knee on September 24, 2009 (Tr. 413-14). Capecci prescribed Vicodin for Hall's pain and advised him to attend physical therapy and remain out of work until his follow-up visit, one month later. (*Id.*). On October 28, 2009, Capecci certified that Hall had "sufficiently recovered"

---

[6] Hall's medical records show he had several orthopedic procedures to address knee issues prior to Capecci's treatment, including arthroscopic synovectomy (Tr. 143), arthroscopic debridement (Tr. 366-67), and arthroscopic medial and lateral meniscectomy (Tr. 381-82).

from the September 24, 2009 procedure and was cleared to resume a normal workload. (Tr. 412).

### 2. Post-Alleged Onset Date

#### a. Dr. Witte – Primary Care

On December 7, 2009, Witte noted that Hall complained of post-surgical knee pain, foot numbness and radiating pain starting in his neck and continuing down his left shoulder. (Tr. 632). Hall estimated he had experienced the pain for two to three weeks, and had been taking Motrin for the pain. (Tr. 938).

Witte's records indicate Hall complained of constant neck and shoulder pain on February 22, 2010. (Tr. 634). An x-ray revealed "moderate dis[c] narrowing with spur formation at C6-7 level." (Tr. 696-97). Witte referred Hall to physical therapy to address the neck and shoulder pain.[7] (Tr. 824). Hall complained of lower quad pain on March 29, 2010. (Tr. 636). On June 25, 2010, Witte referred Hall to Capecci for right knee pain. (Tr. 932). On July 29, 2010, Witte noted Hall had right leg and hip pain for three to four months and prescribed 10mg of Flexeril, three times per day for the pain. (Tr. 953). Hall had an appointment with Witte on September 9, 2010 and reported continued right thigh pain. (Tr. 955-56). Witte noted that Hall should continue taking Flexeril and should also take 800mg of Ibuprofen three times a day. (*Id.*). Hall complained of continued back pain on December 9, 2010 due to heavy lifting and "walking a lot hunting." (Tr. 957-58). Witte noted that an injection for Hall's pain was planned and that he should continue taking Flexeril and Ibuprofen. (*Id.*).

---

[7] Hall attended four physical therapy sessions for his neck and shoulder pain between March 10, 2010 and March 17, 2010. (Tr. 824). At the March 17, 2010 session, Hall reported his symptoms had decreased; however, Hall did not return after the fourth session. (*Id.*).

### b.     Dr. Capecci – Orthopedist

On June 25, 2010, Witte referred Hall to Capecci for right knee pain. (Tr. 932). On July 12, 2010, Hall was seen by Capecci and reported pain going up into his hip from his right knee. (Tr. 853-54). Hall also reported that he was limited in walking and had difficulty using stairs. (*Id.*). An MRI of Hall's right knee was performed on July 16, 2010. (Tr. 978-79). The reading technologist, Richard D. Burritt ("Burritt"), reported a small joint effusion, as well an increase of fluid around the posterior horn of the medial meniscus. (*Id.*).

Capecci's office reviewed the July 16, 2010 MRI with Hall on August 5, 2010. (Tr. 855-56). Hall reported that his knee pain had improved, but the pain had moved to the thigh, groin and right hip areas. (*Id.*). On August 9, 2010, Capecci examined Hall and noted Hall was in severe pain when he attempted the straight leg raising test. (Tr. 857-58). Capecci indicated that all of Hall's imaging was within normal limits, but avascular necrosis needed to be ruled out. (*Id.*). Capecci also noted that Witte had prescribed a muscle relaxer, but it was not helping Hall's pain. (*Id.*). On August 23, 2010, an additional MRI was conducted, which revealed no evidence of "AVN" and small effusions in the hips. (Tr. 834-35). On September 20, 2010, Capecci noted Hall's continued right hip and knee pain. (Tr. 859-60). Hall was able to perform a positive straight leg raising test, but had weakness on dorsi flexion and eversion on the right foot. (*Id.*). Capecci noted a probable L4 disc issue. (*Id.*). Capecci ordered an additional MRI and ultimately referred Hall for pain management. (Tr. 860-61, 919).

### c.     Dr. Grover – Pain Management

Following an MRI in October 2010 for continued knee and hip pain, Capecci referred Hall to Nita N. Grover ("Grover"), MD, at Noyes Memorial Hospital for pain management. (Tr. 861, 919). On October 21, 2010, Hall consulted with Grover and reported

low back pain that radiated down to his leg, beginning in June 2010. (Tr. 919-20). Hall rated his pain at an eight out of ten. (*Id.*). Hall stated that his pain was made worse by walking, stairs, standing, lifting and twisting. (*Id.*). Grover reviewed the October 2010 MRI and assessed that there was "some hemangiomas on L4." (*Id.*). In addition, Grover observed disc desiccation at L3-4 and a "small central dis[c] protrusion" and "a broadbased dis[c] bulge." (*Id.*). According to Grover, the disc protrusion was "posterior to right paracentral." (*Id.*). Finally, Grover observed a "mild central and generally severe bilateral foraminal stenosis." (*Id.*). At L4-5 Grover observed a "broadbased dis[c] bulge with mild bilateral foraminal stenosis." (*Id.*). Hall abruptly left the appointment after he was asked to change for a physical exam. (*Id.*).

Hall returned to Grover's office on November 18, 2010 for a follow-up appointment. (Tr. 921-22). Grover assessed Hall with low back pain radiating to the right lower extremity from a combination of a lumbar herniated disc and lumbar spinal stenosis. (*Id.*). Grover recommended a "lumbar epidural steroid injection" to relieve Hall's pain. (*Id.*). On December 10, 2010, Hall received a steroid injection from Grover. (Tr. 840).

At a follow-up appointment on January 6, 2011, Hall reported that he experienced only two weeks of relief from the December injection. (Tr. 924-25). Upon examination, Grover assessed that Hall also suffered from "a strong element of facet disease." (*Id.*). Given the inefficacy of the epidural injection and the diagnosis of facet disease, Grover recommended discontinuance of the epidural injections, in favor of facet injections. (*Id.*). Hall received facet injections from Grover for his back pain on January 14, 2011. (Tr. 844-45).

Hall treated with Glover on March 10, 2011 and again reported that he had only two weeks of relief from the injections. (Tr. 927-28). Accordingly, Grover recommended that

9

Hall undergo a bilateral median branch block and, if that were unsuccessful, a radiofrequency ablation. (*Id.*). On March 25, 2011, Hall received bilateral median branch blocks. (Tr. 929-30).

    **B.**    <u>**Medical Assessments**</u>

        **1.**    <u>**Boehlert's Consultative Examination**</u>

On June 9, 2010, Sandra Boehlert ("Boehlert"), MD, performed an internal medicine examination on Hall at the request of the Division of Disability Determination. (Tr. 518-23). In her report, Boehlert noted Hall's history of heart disease and Hall's assertion that he is only able to walk one-quarter mile at a time due to shortness of breath and knee pain. (Tr. 518). Boehlert noted Hall's report of obstructive sleep apnea and his nightly use of nasal oxygen. (*Id.*). Boehlert noted Hall's knee pain and past arthroscopies, which Hall claimed had not alleviated his pain. (*Id.*). Boehlert noted Hall's one year of neck pain and that Hall had been told he had two disc problems in his neck. (Tr. 519). Hall reported he had pain from twisting and bending and that physical therapy did not help. (*Id.*). Boehlert also noted Hall's report of right hip pain for two to three years, which Hall reported had been diagnosed as arthritis. (*Id.*).

At the time of the physical examination, Hall weighed 211 lbs. and was 5'10" tall. (*Id.*). Hall was in no acute distress, was able to get on and off the exam table without assistance, and was able to rise from a chair without difficulty. (Tr. 519-20). Hall was unable to walk on his heels and toes due to his reported pain. (Tr. 520). Hall was able to squat one-quarter of the way down, limited by knee pain. (*Id.*). Boehlert's exam indicated no musculoskeletal issues. (Tr. 520-21). Hall's strength was noted as five out of five in both his upper and lower extremities. (Tr. 521). Hall's hand and finger strength and dexterity were intact, and his grip strength was five out of five. (*Id.*).

Boehlert reported that Hall had moderate limitations in ambulation due to hip and knee arthritis and marked limitations in heavy exertion due to his shortness of breath and cardiac disease. (*Id.*).

### 2. Witte's Physical Residual Function Capacity Questionnaire

On April 11, 2011, Witte completed a Physical Residual Function Capacity ("RFC") Questionnaire. (Tr. 959-64). Witte diagnosed Hall with diabetes, sleep apnea, sciatica, polyneuropathy, lumbar spinal stenosis, and depression with diabetes. (*Id.*). Witte's prognosis was that "significant improvement [was] not expected." (*Id.*).

Witte opined that Hall's impairments would frequently interfere with attention and concentration throughout a typical workday and that he could tolerate a moderate level of work stress. (*Id.*). According to Witte, Hall was unable to walk a single city block without severe pain or the need to rest. (*Id.*). In addition, Witte opined that Hall could not sit for more than fifteen minutes without standing or stand for more than fifteen minutes without sitting. (*Id.*). Specifically, Witte noted that Hall would need to walk for a period of five minutes after every fifteen minutes of sitting and would need to have a job that allowed Hall to take unscheduled breaks and shift from sitting to standing at will. (*Id.*). Witte opined that Hall could occasionally lift ten pounds, rarely lift twenty pounds and never lift fifty pounds. (*Id.*). Furthermore, Witte opined that Hall could rarely twist or climb ladders and could never stoop, bend, crouch or squat. (*Id.*). According to Witte, Hall would need to elevate his feet at thirty degrees for fifty percent of the workday. (*Id.*). Although Witte opined that Hall had no significant limitations with reaching, handling or fingering, he also opined that Hall could only be expected to use his hands and fingers to grasp, twist, turn, and manipulate objects for thirty percent of the workday and reach only fifteen percent of the workday. (*Id.*). He did not explain

that apparent inconsistency. Finally, Witte estimated that Hall would likely be absent from work for more than four days a month due to Hall's impairments or treatments. (*Id.*).

      C.      **<u>Additional Evidence Submitted to the Appeals Council</u>**

Following the ALJ's unfavorable decision, Hall submitted additional medical records to the Appeals Council. (Tr. 1008-154).

On March 28, 2011, Hall reported to Witte he was only able to walk ten to fifteen feet at a time following a nerve block procedure. (Tr. 1153-54). Hall also reported he had trouble doing normal activities and was in "lots of pain" from bending, twisting and climbing. (*Id.*). On April 22, 2011, Hall underwent a radio frequency ablation procedure for his back pain. (Tr. 1023-24). Hall reported continued leg pain at a follow-up cardiac appointment with Iqbal on May 2, 2011. (Tr. 1053-54).

On June 3, 2011, Hall reported to Grover that he was having difficulty performing activities of daily living due to low back and leg pain. (Tr. 1022). Grover recommended a repeat of the ablation procedure and an epidural steroid injection. (*Id.*). On July 22, 2011, Hall received a steroid injection and radiofrequency denervation for his back pain. (Tr. 1019-21). At a follow-up appointment with Grover on August 18, 2011, Hall reported that the procedures had alleviated the pain in the right side of his back, but that he continued to experience pain on his left side. (Tr. 1017-18). Grover prescribed Gabapentin to address his continued back pain and Voltaren gel for his neck pain. (*Id.*).

Hall returned Noyes Memorial Hospital for pain management on September 22, 2011. (Tr. 1015-16). During the visit, Hall met with Lai Kuang ("Kuang"), MD. (*Id.*). Hall reported that the Gabapentin did not provide relief. (*Id.*). Hall recommended a left joint injection to address Hall's continued left-side low back pain, increased the Gabapentin dosage

Case 6:12-cv-06639-MWP   Document 18   Filed 09/30/14   Page 13 of 20

and continued the prescription for Voltaren. (*Id.*). On October 7, 2011, Kuang administered the left sacroiliac joint injection. (Tr. 1013-14).

On October 12, 2011, Hall visited Capecci's office with complaints of left knee pain. (Tr. 1042-44). Hall reported that he was experiencing cracking and popping in the left knee and that the pain had started two weeks prior to his visit. (*Id.*). The exam showed a full range of motion, no effusion and no significant crepitus. (*Id.*). On October 21, 2011, Hall received a cortisone injection in his left knee. (Tr. 1045-47). Hall reported that the pain was getting worse and asked about a knee brace. (*Id.*).

On December 22, 2011, Hall attended a follow-up appointment with Grover. (Tr. 1011). During the appointment, Hall reported recent onset of neck pain that radiated to his left upper arm. (*Id.*). Grover recommended an MRI. (*Id.*). The MRI was interpreted by Omar Qureshi, MD, who opined that it demonstrated "severe cervical spondylosis" at C5-C6 and to a lesser extent at C6-C7. (Tr. 1009-10). He also noted an "elevated cord signal suggestive of myelomalacia" at the C5-C6 level. (*Id.*).

## DISCUSSION

I.  **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and DIB if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

> (1) whether the claimant is currently engaged in substantial gainful activity;
>
> (2) if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3) if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4) if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5) if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

### A. The ALJ's Decision

In his decision, the ALJ applied the required five-step analysis for evaluating disability claims.  Under step one of the process, the ALJ found that Hall has not engaged in substantial gainful activity since November 25, 2009, the alleged onset date.  (Tr. 22).  At step two, the ALJ concluded that Hall has the severe impairments of coronary artery disease with

15

cardiac arrhythmia, chronic low back and neck pain, bilateral degenerative joint disease of the knees, diabetes with possible lower extremity neuropathy, and mild chronic obstructive pulmonary disease, but that Hall's other impairments – including sleep apnea, hypertension, peptic ulcer disease, hyperlipidemia, gastroesophageal reflux disease, right hip pain and Bell's palsy – were nonsevere.  (Tr. 22-23).  At step three, the ALJ found that Hall does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 25).  The ALJ concluded that Hall has the RFC to perform slightly less than the full range of sedentary work with environmental restrictions, namely, avoiding concentrated exposure to respiratory irritants such as fumes, odors, dusts, gases, and poor ventilation.  (Tr. 26).  Finally, the ALJ determined that Hall is unable to perform any past relevant work, but that – considering his age, work experience, education and RFC – jobs exist in significant number in the national economy that Hall could perform.  (Tr. 30-31).  In conclusion, the ALJ found that Hall is not disabled.  (*Id.*).

      **B.**     <u>**Hall's Contentions**</u>

Hall contends that the ALJ's determination that he is not disabled is not supported by substantial evidence.  (Docket # 12-1).  First, Hall maintains that the ALJ committed legal error when applying the treating physician rule to weigh the medical opinions of record and argues that the ALJ's RFC determination is not supported by substantial evidence.  (*Id.* at 14-19).  Next, Hall contends that the ALJ erred by not consulting a vocational expert at step five.  (*Id.* at 19-21).  According to Hall, the ALJ committed error by failing to properly assess his complaints of debilitating pain.  (*Id.*).  This error, Hall argues, caused the ALJ to conclude that his non-exertional limitations of pain "had little to no effect on the occupational base of sedentary

work," which led the ALJ to incorrectly conclude that testimony from a vocational expert was unnecessary.  (*Id.*).

## II.   Analysis

"Evidence of pain is an important element in the adjudication of DIB and SSI claims, and must be thoroughly considered in calculating the RFC of a claimant." *Meadors v. Astrue*, 370 F. App'x 179, 185 (2d Cir. 2010).  Generally, a claimant's statements of pain or other limitations are not sufficient alone to establish a medically determinable impairment; instead, "plaintiff must demonstrate by medical signs or findings that [he] has a condition that could reasonably be expected to produce the alleged symptoms."  *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2003); *Meadors v. Astrue*, 370 F. App'x at 185 ("[a] claimant who alleges a disability based on the subjective experience of pain need not adduce direct medical evidence confirming the extent of the pain, but [instead] medical signs and laboratory findings which show that the claimant has a medical impairment which could reasonably be expected to produce the pain") (quotations omitted) (alteration in original); *see Skiver v. Colvin*, 2014 WL 800228, *6 (W.D.N.Y. 2014).  "While subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings, the ALJ is nonetheless empowered to exercise discretion to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Taylor v. Barnhart*, 83 F. App'x at 350 (internal quotation omitted).

The regulations provide for a two-step inquiry to evaluate a claimant's contentions of pain.  *See Meadors*, 370 F. App'x at 183 (citing Social Security Ruling 96-7P, 1996 WL 374186 (S.S.A.); 20 C.F.R. § 404.1529(c)).  The ALJ must first determine whether

17

"the claimant suffers from a 'medically determinable impairment[] that could reasonably be expected to produce' the pain alleged." *See id.* (quoting 20 C.F.R. § 404.1529(c)(1)). Once the claimant has established a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms, the ALJ "'must then evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting 20 C.F.R. § 416.929(c)(1)). When the claimant alleges "symptoms of greater severity than can be established by the objective medical findings, the ALJ will consider other evidence, including factors such as the daily activities; the nature, extent and duration of symptoms; and the treatment provided." *See Skiver v. Colvin*, 2014 WL 800228 at *6 (citing 20 C.F.R. § 416.929(c)(3)). When conducting his evaluation, the Commissioner's role is "to resolve evidentiary conflicts and to appraise the credibility of witnesses." *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983).

Hall asserts that debilitating back pain is the principal obstacle to employment. (Tr. 1205). In his decision, the ALJ specifically recognized his duty to conduct the two-step credibility inquiry in assessing Hall's complaints of pain. (Tr. 26). The ALJ concluded "[a]fter careful consideration of the evidence" that Hall's "medically determinable impairments could reasonably be expected to cause the alleged symptoms, and that [Hall's] statements concerning the intensity, persistence and limiting effects of these symptoms are partially credible." (Tr. 29). In reaching this conclusion, the ALJ discussed at length Hall's medical history, subjective complaints, work history and his testimony concerning his activities of daily living. (Tr. 26-29). The ALJ recognized that Hall "alleges that his . . . back pain [has] increased substantially in the very recent past," but found that "the medical evidence does not support this allegation." (Tr.

29).  When evaluating Hall's subjective complaints of pain, the ALJ concluded that "the medical record reveals nothing more than conservative pain management treatment."  (Tr. 27).

In making these determinations, however, the ALJ did not discuss the pain management treatment that Hall received from Grover or cite to Grover's treatment records. (*Compare* Tr. 20-32 *with* Tr. 918-30).  As discussed above, those records reveal that Hall received ongoing treatment for back pain, including steroid injections, nerve blocks and subsequently a radiofrequency ablation.  (Tr. 918-30).  According to Grover, Hall's October 2010 MRI showed "generally severe bilateral foraminal stenosis," and a December 2011 MRI showed "severe cervical spondylosis noted at the C5-C6 level."[8]  (Tr. 919, 1009).  In his decision, the ALJ, by contrast, cited earlier records showing "moderate" degenerative changes at the C6-C7 level and "mild arthritic changes . . . with no significant disc space narrowing or spondylolisthesis."  (Tr. 23).

Under 20 C.F.R. § 404.1520(3), the ALJ must "consider all evidence" in order to determine whether a claimant is disabled, although the ALJ is not required to discuss every piece of evidence submitted, and his failure to do so does not necessarily demonstrate that he did not consider the evidence.  *See Santos v. Astrue*, 709 F. Supp. 2d 207, 211 (S.D.N.Y. 2010).  Upon review of the ALJ's otherwise thorough decision, I conclude that a strong likelihood exists that the ALJ overlooked Grover's treatment records.  Those records provide evidence that potentially contradicts the ALJ's conclusions that no objective medical evidence supported Hall's recent complaints of back pain and that Hall's treatment for back pain was "conservative."  Accordingly, I cannot conclude that the ALJ's failure to consider Grover's treatment records was harmless or that the ALJ's credibility assessment is supported by substantial evidence.  *See Stebbins v. Astrue*, 2008 WL 4855558, *18 (W.D.N.Y.) (ALJ's credibility finding not supported

---

[8] The records reflecting the December 2011 MRI were submitted to the Appeals Council.  (Tr. 10, 1009).

by substantial evidence where ALJ failed to consider physician's assessment and treatment notes), *report and recommendation adopted*, 2008 WL 4855464 (W.D.N.Y. 2008). Indeed, consideration of Grover's treatment notes could have affected not only the ALJ's credibility assessment, but also his assessment of the proper weight to be afforded to the medical opinions of record and his determination not to obtain vocational expert testimony. For these reasons, I conclude that remand is appropriate to permit the ALJ to consider Grover's treatment notes and determine whether such consideration affects the determination of disability.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 9)** is **DENIED**, and Hall's motion for judgment on the pleadings **(Docket # 12)** is **GRANTED in Part and DENIED in Part**. This matter is remanded pursuant to 42 U.S.C. § 405(g), sentence four, to the Commissioner for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
September 30, 2014